PIEDMONT AVIATION, INC. v. S & W MOTOR LINES, INC.

(Filed 12 June 1964.)

**1. Corporations § 24—**

Evidence tending to show a contract was made for defendant corporation by its president for the maintenance and repair of airplanes, that plaintiff performed the work under the contract during the term thereof, and that part of the charges was for work done on an airplane which defendant corporation owned and still owns, *is held* to repel nonsuit on the ground that the contract was primarily for the benefit of another corporation of which the same person was president, and was therefore *ultra vires* defendant corporation. G.S. 52-18 curtails to a considerable degree the doctrine of *ultra vires*.

**2. Frauds, Statute of § 5—**

Evidence tending to show that plaintiff, before undertaking to perform work in the maintenance and repair of airplanes, called the president of defendant corporation and obtained the promise of the president that defendant corporation would pay the amounts which should become due under the contract, and further that at least some of the work and labor performed under the contract was for the benefit of defendant corporation, *is held* to repel nonsuit on the defense that the action is barred under the provisions of G.S. 22-1, since the evidence tends to show the promise was an original promise not coming within the statute.

**3. Trial § 40—**

In an action for work and labor performed pursuant to an agreement for the maintenance and repair of certain airplanes, the demand being for the total of a number of items on an account, the submission of the case to the jury under the single issue of indebtedness and the refusal to submit issues tendered, *is held* erroneous, since the jury, if it found for plaintiff, was required to find the indebtedness in the sum demanded, and there was neither allegation nor proof by either party that the work done and materials furnished were to be performed for an agreed sum or what constituted the reasonable value of the labor and materials furnished.

APPEAL by defendant from *Johnston, J.,* 21 October 1963 Civil Session of FORSYTH.

Civil action to recover for alleged labor and materials · furnished, sold and delivered to defendant upon an express contract to pay and upon an account duly stated and rendered in the amount of .$10,166.20, with interest on $3,862.54 from 31 January 1959 until paid, with interest on $2,330.14 from 19 March 1959 until paid, with interest on $1,852.11 from 26 April 1959 until paid, with interest on $984.90 from 31 August 1960 until paid, and with interest on $136.51 from 30 April 1960 until paid. A statement of the account is attached to the complaint and market Exhibit A. The various amounts alleged in the complaint upon which interest is prayed · from various dates total $9,-166.20. An examination of the statement of account attached to the

complaint seems to show that the figures $1,852.11 should be $2,852.11.

Defendant in its answer denies that it is indebted to plaintiff in any amount. By way of further answer and defense and in bar of any recovery, defendant alleges in substance:

One.   If any of the items listed on the statement of account attached to the complaint and marked Exhibit A are for work done or materials furnished by plaintiff at the request of defendant, which is denied, then defendant has paid for them in full and has paid any and all sums due by it to plaintiff.

Two.   It alleges, on information and belief, that all items on the statement of account attached to the complaint and marked Exhibit A are for work done and materials furnished by plaintiff to Miami Airlines, Inc., a Florida corporation, in connection with the maintenance and operation of certain aircraft by Miami Airlines, Inc., when its offices were located in Greensboro, North Carolina. That none of this work done and materials furnished by plaintiff for Miami Airlines, Inc., was requested by defendant, and defendant did not enter into any agreement or give any undertaking to plaintiff to pay for the same, and that any sums alleged to be due by defendant to plaintiff in its complaint are the debt and obligation of Miami Airlines, Inc., and not this defendant.

Three.   Defendant specifically pleads the provisions of G.S. 22-1 (promise to answer for debt of another), in bar of any recovery herein by plaintiff.

Each party introduced evidence in support of the allegations in its pleading.

After the evidence was ended, plaintiff tendered to the court the following issues, which the trial court declined to submit to the jury:

"1.   Did the defendant contract and agree with plaintiff that defendant would pay plaintiff for labor and materials furnished, as alleged in the Complaint?"

"2.   What amount, if any, is the plaintiff entitled to recover of the defendant?"

At the same time defendant tendered to the court the following issues, which the trial court declined to submit to the jury:

"1.   Did the defendant through its duly authorized officer promise to pay the plaintiff for materials and labor, as alleged in the Complaint?"

"2. Were the labor and materials furnished of benefit to the defendant?"

"3. Was the contract, if any, between plaintiff and defendant in writing?"

"4. What amount, if any, is plaintiff entitled to recover of defendant?"

The trial court framed and submitted to the jury the following issue:

"Is the defendant indebted to the plaintiff as alleged in the plaintiff's Complaint?"

The jury answered the issue: "Yes, $10,166.20, plus 6% interest as indicated in the Complaint." Defendant excepted to the one issue submitted by the trial judge to the jury.

From a judgment entered in conformity with the verdict, defendant appeals.

*Block, Meyland & Lloyd by A. L. Meyland and Henry H. Isaacson for defendant appellant.*

*Blackwell, Blackwell, Canady & Eller by Jack F. Canady for plaintiff appellee.*

PARKER, J. Milton F. Fare, a witness for plaintiff, testified in substance, except when quoted: He has been an officer of plaintiff for 23 years, to wit, its secretary and assistant treasurer. His duties consisted of the supervising of its books and accounts, the billing for services rendered, the extension of credit, and the collection of accounts. The account of defendant with plaintiff has been under his personal supervision since its inception in 1957 when defendant purchased a DC-3, No. N-21798, airplane. The books and accounts of plaintiff show an account due it by defendant in the amount of $10,-166.20 covering the period from 1 December 1958 through 31 March 1960. This account covers maintenance, inspection, and repair primarily on DC-3 airplanes, and in some cases for parts purchased. This account was sent to defendant and is due and unpaid.

In June 1957 plaintiff performed a major overhaul and conversion job for defendant on a DC-3 airplane, No. N-21798, owned by defendant, and the bill was approximately $41,000. In June 1958 plaintiff began a series of work on airplanes, and it ran through 31 March 1960. George H. Sharp, president of defendant, authorized the work on these airplanes. The account for $10,166.20 sued on covers work on a DC-3,

No. N-21798, and he has been able to trace $6,405.07 to this airplane, which airplane was owned by defendant during the period 1958 through 1960. This account also covers work done by plaintiff on another DC-3 airplane and a DC-4 airplane, which were sent to plaintiff by defendant. "He called Mr. Sharp in June, 1958, after these aircraft had come into plaintiff's shop, and told him he would like to work out an arrangement for payment. The aircraft that was owned by S & W Motor Lines, Inc. and registered in its name had 'Miami Airlines' painted on its side and, since he had no information on Miami Airlines, he couldn't do any work and charge it to that company because he didn't know anything about it. He stated Mr. Sharp told him to bill it to S & W Motor Lines, and they would pay it." He also testified: "Mr. Sharp stated S & W Motor Lines was promising to send the payments, that S & W Motor Lines, Inc. was the company to whom billings were rendered and to whom credit was extended. He stated that on several occasions, Mr. Sharp gave the reasons for the account getting so large and delinquent that his trucking company business was not good, or the S & W Motor Lines' business was not good, he had had to buy licenses for his over-the-road vehicles, his trucks, and he just didn't have the money, but he would promise to pay when he could. He stated that S & W Motor Lines, Inc. promised to pay when it could." In his conversations with Mr. Sharp in trying to collect this account, Mr. Sharp never denied that defendant owed this account. The first time that Mr. Sharp ever denied that defendant owed this account was in a letter from his attorney dated 19 July 1960.

Defendant's office was located at 3300 High Point Road, Greensboro, North Carolina, and the office of Miami Airlines was located at the same place. Mr. Sharp was president and owner of Miami Airlines and was president of defendant. He never extended any credit to Miami Airlines. The account sued on was carried in the name of defendant.

Mr. Fare testified in substance on cross-examination and recross-examination, except when quoted: He knew defendant was a North Carolina corporation when it purchased a DC-3 aircraft, No. N-21798, and arranged for plaintiff to perform a major overhaul on it at a cost of $41,693.06. He is generally familiar with certificates of ownership for aircraft issued by FAA, formerly CAA, and according to FAA regulations the registration certificates were required to be in the aircraft at all times. The registration certificate shows the registered owner of the aircraft. The name "Miami Airlines" appearing on the shop work orders after the name "S & W Motor Lines" was for identi-

fication purposes. After June 1958 all his conversations with Mr. Sharp were over the telephone. Credit reports received by him showed that Miami Airlines was a Florida corporation, and that Mr. Sharp was its principal owner. The credit reports did not indicate that defendant owned any stock in Miami Airlines. "Mr. Sharp, in a conversation, told him to bill S & W and that S & W would pay for the mainte-nance services on the various aircraft. This conversation occurred in early June 1958, before Mr. Fare received the letter from Mr. Boyd Royal, general manager of S & W, dated July 29, 1958 (defendant's exhibit 14), stating the account was paid in full." He did not ask Mr. Sharp to confirm any of the conversations by letter. Mr. Sharp had done business with plaintiff for several years, and "we accepted his statements at face value. We trusted him. We extended credit to the S & W Motor Lines and we relied on what he told us." He does not know if any payments were received from S & W Motor Lines after the conversation in June 1958. He received letters from Miami Airlines and wrote to them, but it was a mistake. His testimony on direct examination that the airplanes were sent to plaintiff's work shop by S & W Motor Lines was hearsay. He received some letters from Miami Airlines, Inc., signed by G. H. Sharp as president. The only communi-cation received from S & W Motor Lines signed by Mr. Sharp as president was the letter dated 10 February 1961 denying S & W Motor Lines owed the account.

He testified on redirect examination: "The invoices were addressed as follows:

> S & W Motor Lines, Inc.
> Miami Airlines
> 3300 High Point Road
> Greensboro, North Carolina"

Archie Ferguson, a witness for plaintiff, testified in substance: He has been employed by plaintiff for ten years in the position of main-tenance supervisor. Mr. Sharp, whose voice he knew from prior con-versations, called him on the telephone and identified himself with S & W Motor Lines, and ordered work done on aircraft during 1958, 1959, and early 1960, during the period covered by the account sued on. He testified in substance on cross-examination: Mr. Sharp had possibly 15 conversations with him in 1957 during the period of three months when defendant's DC-3 airplane, No. N-21798, was in the shop. The airplanes came into plaintiff's work shop for maintenance at all times of the day or night. There was usually a call before ar-

rival from S & W Motor Lines. Miami Airlines operated two C-46 type aircraft, and also a DC-4, No. N-90443.

G. H. Sharp, a witness for defendant, testified in substance, except when quoted: He has been president of S & W Motor Lines since its incorporation in 1949 as a long-haul freight transportation company by motor vehicles and all kinds of vehicles of whatever nature. He was president of Miami Airlines, Inc., a Florida corporation, a non-scheduled airline regulated by FAA and CAA, during the period 1957-1960, and severed his connection with it in the spring of 1960. He never owned any stock in Miami Airlines, Inc. After he became president of Miami Airlines in October 1957, its offices were moved from Miami, Florida, to 3300 High Point Road, Greensboro, North Carolina, where its offices were located on the second floor of a three-story building. S & W Motor Lines' offices were on the first floor of the same building. Separate telephone facilities were maintained by each corporation. Miami Airlines was never operated as a part of or in conjunction with S & W Motor Lines. The bookkeeping was separate, the bank accounts were separate, and checks were signed by different persons. The S & W Motor Lines was, and still is, the owner of a DC-3, No. N-21798, having acquired it in 1957. About five years prior to that, S & W Motor Lines had acquired a twin Beech aircraft. The airplane DC-3, No. N-21798, was leased to Miami Airlines in 1957, 1958, 1959, and a portion of 1960. Miami Airlines operated another DC-3 airplane owned by Ayer Lease Plan of New Jersey, under lease, and two C-46 aircraft. He identified defendant's Exhibits 27 and 28 as certified copies of certificates of registration from the FAA showing ownership of the plane as described above. He identified written leases dated 1 October 1957 and 1 January 1958 between S & W Motor Lines and Miami Airlines covering lease of the aircraft DC-3, No. N-21798, to the effect that the maintenance of this plane was the responsibility of Miami Airlines. As an officer of S & W Motor Lines, he never authorized any work on the Miami Airlines' planes. He recalls talking with Mr. Fare in 1958 about the airplanes and Mr. Fare did not address him as president of either corporation but called him by his name. He recalled conversations with Mr. Archie Ferguson over the telephone about work on Miami Airlines' planes, but did not tell Mr. Ferguson in those conversations that the work was authorized by S & W Motor Lines, or that S & W Motor Lines would pay for the work. In his conversations with Mr. Fare about the aircraft, most of which were about money, he would tell him "we," meaning Miami Airlines, would send him money. Miami Airlines sent some money, but S & W Motor Lines never sent any money in this period.

He testified in substance on cross-examination: In 1958, 1959, and 1960 he was president of S & W Motor Lines and owned 416 of its shares, his wife was vice-president and owned 1 share, his daughter owned 107 shares, a bank held as trustee for his son 321 shares, and Boyd Royal, secretary and general manager, owned 1 share. He had been examined under oath in March 1963 in connection with this case. At the prior hearing he had testified that he was the sole owner of Miami Airlines, owning 100 per cent of the stock, and that he sold his interest in Miami Airlines in the early part of 1960; that the stock was issued in the name of Bob Higgins, but that Bob Higgins did not have an interest in the company but was just an employee, and that he preferred not to put it in his own name; when he stated he owned 100 per cent of the stock of Miami Airlines, it was a mistake; the stock was held in escrow by Mr. R. W. Duff of Miami. He recalls receiving numerous letters addressed to him as president of S & W Motor Lines from Mr. Fare concerning payments on account, and he never contacted Mr. Fare to tell him S &.W Motor Lines did not owe the money and that the billing was wrong until February 1961. At the time of the leases between Miami Airlines and S & W Motor Lines, both companies were in the same building, and he never notified plaintiff of the leases. He supposed he got two letters from Mr. Fare requesting financial information as to Miami Airlines, but he never furnished any financial information as requested. He was shown a financial statement of S & W Motor Lines and a financial statement of Miami Airlines and was asked if it was not true that S & W Motor Lines had loaned Miami Airlines over $100,000 during the period of the account sued on. He replied as follows: "It could have been, I don't deny it, no, Mr. Royal can answer that question better than I can." It might be that S & W Motor Lines during the period of this account charged off a substantial amount of money it loaned to Miami Airlines.

He testified on redirect examination in substance: Most of the Miami Airlines documents were removed to Texas in 1960, and later in Texas it went into bankruptcy.

Boyd Royal, a witness for defendant, testified in substance, except when quoted: He has been secretary and general manager of S & W Motor Lines since 1949. He paid all the bills and signed all the checks for S & W Motor Lines in 1957 through 1960. On 29 July 1958 he sent a check to plaintiff, paying S & W Motor Lines' account in full, with a letter stating as follows: "Attached hereto is our check, amount $1234.66, to cover account in full for S & W Motor Lines, Inc. The invoice number 6-1858, dated June 29, listed on your statement to

S & W Motor Lines, should be charged to Miami Airlines, Inc." Prior to that time he never received any bill for charges of Miami Airlines against S & W Motor Lines. The payments made on the plaintiff's account from December 1958 to February 1960 were never made by S & W Motor Lines. He examined the invoices in plaintiff's account, and none of them were ever entered on the books of S & W Motor Lines. No payments thereon were ever made by S & W Motor Lines.

Defendant assigns as error the denial of his motion for judgment of compulsory nonsuit made at the close of all the evidence.

The evidence of plaintiff, considered in the light most favorable to it, and of defendant favorable to it, *Sugg v. Baker,* 261 N.C. 579, 135 S.E. 2d 565, would permit a jury to find that a contract was made in the name of the corporate defendant, by its president G. H. Sharp, with plaintiff for the maintenance and repair of airplanes, that the contract provided that the corporate defendant would pay for this work, and that this contract was in effect during the period of time covered by the account sued on. That pursuant to such contract, and while it was in effect, plaintiff did work and furnished materials on airplanes, which G. H. Sharp authorized to be done, and that there remains due and unpaid on this work the sum of $10,166.20 with interest on various amounts of this sum from various dates, as shown by the account sued on which is attached to the complaint as Exhibit A. That of this amount of $10,166.20, $6,405.07 is for work done on a DC-3 airplane, No. N-21798, which defendant's evidence shows was purchased by the corporate defendant in 1957, and which it still owns.

Defendant contends in brief that, in the absence of a charter or by-law provision to the contrary, the president of a corporation is the general manager of its corporate affairs, and that his contracts made in the name of the company in its general course of business and within the apparent scope of his authority are ordinarily enforceable, but the president G. H. Sharp had no implied authority to bind the corporate defendant to pay for materials and services furnished on airplanes owned by or leased to Miami Airlines, Inc., which G. H. Sharp owned. It cites in support of its contention *Tuttle v. Building Corp.,* 228 N.C. 507, 46 S.E. 2d 313, a case decided in 1948. It contends in brief that the acts of its president in making the contract in its name alleges in plaintiff's complaint are *ultra vires.* That plaintiff's evidence shows that the account sued on covers work done on airplanes leased to or owned by Miami Airlines, Inc., which G. H. Sharp owned at the time.

Defendant in making this contention overlooks the fact that plaintiff's evidence shows that of the amount of $10,166.20 sued for, $6,-405.07 is for work done on a DC-3 airplane, No. N-21798, which defendant's evidence shows it purchased in 1957 and still owns.

In 1955, subsequent to the decision in 1948 in the *Tuttle* case, the General Assembly enacted a "Business Corporation Act," which became effective 1 July 1957. A part of this Act set forth in G.S. 55-18 has curtailed to a considerable degree the doctrine of *ultra vires*. The *ultra vires* provision of our "Business Corporation Act" was in question in *Everette v. D. O. Briggs Lumber Co., Inc.*, 250 N.C. 688, 110 S.E. 2d 288. Defendant was a South Carolina corporation, whose president, the owner of 90% of its outstanding stock, contracted with plaintiff in the name of the defendant corporation for the transportation of lumber for an independent lumber company in North Carolina. The plaintiff performed services, and when the defendant corporation refused to pay plaintiff, suit was brought. Defendant raised the defense of *ultra vires* on the grounds that it had not authorized such a contract with plaintiff and had no interest in the transaction, that it did not benefit from it, and that in reality it was for the benefit of its president as an individual since he was a stockholder of the North Carolina firm. The Court held that under the provisions of G.S. 55-18 of our "Business Corporation Act" *ultra vires* was not available as a defense to defendant in a suit brought against him by an outside contracting party to recover on a contract made with defendant, and affirmed a judgment against defendant. Following our decision in the *Everette* case, the doctrine of *ultra vires* is not available as a defense to defendant in the instant suit.

Defendant further contends that plaintiff's evidence shows that the contract sued on was oral, was to pay the debt of another, and that its action is barred by the provisions of G.S. 22-1. This contention finds no support in plaintiff's evidence considered in the light most favorable to it. The cause of action alleged in the complaint, which plaintiff's evidence supports, is based upon an original contract of defendant corporation, made for it in its name by its president, to pay for labor and materials furnished on airplanes, and consequently does not come within the provisions of G.S. 22-1. *Pegram-West v. Insurance Co.*, 231 N.C. 277, 56 S.E. 2d 607. Defendant in its answer denies that it made any contract with plaintiff to pay for any work on airplanes.

The court properly denied defendant's motion for judgment of compulsory nonsuit made at the close of all the evidence.

As set forth above, in apt time plaintiff tendered to the trial court two issues, and defendant four issues. The trial court refused to submit the issues tendered by the parties, and submitted one issue reading as follows: "Is the defendant indebted to the plaintiff as alleged in the plaintiff's complaint?" Defendant excepted to the one issue submitted and assigns this as error. The jury answered the issue: "Yes, $10,-166.20, plus 6% interest as indicated in complaint."

The question raised by this assignment of error is controlled by *Baker v. Construction Corp.*, 255 N.C. 302, 121 S.E. 2d 731. Following this case, we hold that defendant was entitled to have submitted an issue relating to whether defendant entered into the alleged contract with plaintiff, and that the failure to submit such an issue is prejudicial error.

The prejudicial effect to defendant of submitting this one issue as phrased is shown by the closing words of the charge:

> "The Court instructs you, members of the jury, that if the plaintiff has satisfied you by the greater weight of the evidence, the burden being upon the plaintiff to so satisfy you that the plaintiff furnished and delivered the goods and services as alleged in the plaintiff's complaint to the defendant, and that such was furnished and delivered at the request of the defendant acting through its president or agents or employees, then the Court instructs you it will be your duty to answer this issue YES. If the plaintiff has failed to so satisfy you, then it will be your duty to answer the issue NO."

Under this charge if the jury answered the issue Yes, then it had no alternative, and was required to find that defendant was indebted to plaintiff in the sum of $10,166.20 plus interest, even if the jury was not satisfied by the greater weight of the evidence that all the items in the account sued on were correct in amount and justly owed by defendant. There is neither allegation nor proof by either party that the work done and materials furnished were to be performed for an agreed sum, and neither allegation nor proof by either party as to the reasonable value of such labor done or materials furnished.

Defendant is entitled to a

New trial.